IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SAMUEL KEMOKAI,

                Petitioner,

      vs.

RICK HILL, Warden, Folsom State Prison,[1]

                Respondent.

No. 2:17-cv-01776-JKS

MEMORANDUM DECISION

Samuel Kemokai, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Kemokai is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Folsom State Prison. Respondent has answered, and Kemokai has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

Kemokai, along with co-defendants George Christian and Tommy Cornelius, was charged with the attempted murder of Santana Robinson and various other offenses in connection with the group beating of a man at a gas station on Halloween night 2008. The information further alleged as to the attempted murder that Kemokai personally used a firearm, was a principal in the offense, and committed the offense for the benefit of the Killa Mobb street gang. On direct appeal of his conviction, the California Court of Appeal laid out the following facts underlying the charges against Kemokai and the evidence presented at the joint trial:

---

[1]      Rick Hill is substituted for Ron Rackley as Warden, Folsom State Prison. FED. R. CIV. P. 25(d).

A

*Charged Offenses*

The victim and his friends were at the Shell station to pump gas after attending a local party.  At the gas station, one of the victim's friends saw a black Dodge Charger and a green Ford Taurus.  Associated with the black Dodge Charger were two men—Christian (wearing an orange shirt and white and orange hat) and Whitfield (wearing a purple shirt with no other shirt underneath the purple one).  Both men had guns, one of which looked like a ".380."  Christian had a verbal altercation with the man sitting in the green Taurus and then chased off the Taurus while waving a gun.  One of the victim's friends heard Christian and Whitfield saying, "'We Killas out here.'"

After the altercation between Christian and the occupant of the Taurus, the victim (who had just finished paying for his gasoline), was walking back to his own car and was approached by Christian.  Christian asked where the victim was from, and the victim responded, "'San Francisco.'"  Christian then said "his gang['s] name," which was two syllables,[FN1] and hit the victim "pretty hard" in the head, knocking him temporarily unconscious.

> FN1.   A friend of the victim, who was at the beating, recalled someone yelling out "Killa Mobb" that night.

Within seconds, a group of people surrounded the victim and were attacking "like a pack" of "hyenas on him."  The attackers included Christian, Kemokai, Whitfield, Cornelius, Demetrius Royster, Drew Dotson,[FN2] and Ravneel Atwaal, the latter who was granted use immunity for his trial testimony.  Atwaal was portrayed at trial by the defense as a rich boy who lived in a nice suburban neighborhood and drove a Lexus.  Another Killa Mobb member, Richard Lee, also was in the group who surrounded the victim and had a gun.  Atwaal did not see Lee beat the victim or use the gun on the victim, although one Rafael Simpson saw Lee beating the victim with Lee's own gun.[FN3]

> FN2.   Royster and Dotson were charged with crimes relating to the beating of the victim but neither of them are parties to this appeal.

> FN3.   Simpson had been a member of Killa Mobb and was with the attackers at the Shell gas station.  He denied hitting or kicking anybody that night.  He saw Christian start the fight by pistol whipping the victim in his face. When shown a video of the beating at trial, Simpson identified Cornelius as the man with the purple short-sleeved shirt over a long-sleeved white shirt.  The man wearing that clothing can be seen on the video kicking the victim in the head.  Simpson had been jumped out of Killa Mobb at the time of the Shell gas station beating.  He left Killa Mobb because the gang was "[a]lways fighting" and that lifestyle "wasn't for [him]."

Part of the group beating that was captured on video was played at trial.  Atwaal also testified to what he saw on the video.  At one point in the beating, Christian was outside the circle of attackers, but then he worked his way back in by shoving others out

2

of the way.  Christian lifted his arm over his head and swung downward toward the victim.  The victim tried to roll away from the attack, but Christian and Kemokai pursued him.  Christian slipped on the wet concrete but got back up and kicked the victim in the head.  After Whitfield repeatedly stomped on the victim and walked away, Kemokai hit the victim in the upper body/head area with two overhead, heavy blows.  Kemokai, Christian, and Cornelius searched the victim.  Christian pistol whipped the victim in the head.  Christian fled, leaving Cornelius and Kemokai with the victim.[FN4]  Cornelius kicked the victim's head and walked away, while Kemokai stood motionless over the victim.  Kemokai pulled out a firearm from his waistband or pants, raised the firearm over his head, and delivered one blow to the victim's head with the firearm.  The victim's body jerked upward.

FN4.   Christian's hat came off during the beating, and Simpson picked it up.

As a result of the beating, the victim had multiple lacerations to his head and face, a fracture to the upper jaw, and was at risk of a concussion and serious neck injury.

Before the attack, the victim had on him his cell phone, a wallet, and a digital camera.  After the attack, he was missing his cell phone and camera.

## B
### *Investigation Of The Shell Gas Station Beating*

Metro PCS cell phone records were recovered from some Killa Mobb members involved in the beating.  Some text messages sent after the beating stated things like "'we shot up that shit, killa,'" "[t]hey got five people now," "[s]top texting mother fuckers. Stay focused."

Eleven days after the beating, police found Lee driving a car, and Lee correctly told police that they would find his .380-caliber gun in the pouch behind the front passenger seat.  The gun was loaded and included one CCI brand round.  Police went to Whitfield's house to conduct a search because police had overheard Whitfield telling another suspect in a police interview room that they had hidden something in Whitfield's couch.  That something turned out to be nine .380-caliber live ammunition rounds, including four rounds of the CCI brand.

## C
### *Gang Evidence*

Sacramento Police Department Detective Brian Bell was the lead investigator and was also the People's expert on street gangs in Sacramento's north area.  Killa Mobb's primary activities included "burglaries, robberies, shootings, [and] unlawful gun possession."  He based this opinion on his eight and one-half years as a police officer, two and one-half years as a gang detective, being the lead investigator in this case, being the lead investigator on at least 30 other gang crimes, and assisting on 60 other gang crime investigations, reviewing police data bases "for informational purposes to gather ... information about Killa Mobb," being in daily contact with gang members, including at least 15 members of Killa Mobb that included "conversations" with Killa Mobb members

3

and associates about that gang's "culture and crimes," and viewing MySpace pages that included photographs of gang members with messages stating what gang a certain person was in.  Some of these MySpace pages included photographs of Lee, Whitfield, Christian, Dotson, Cornelius, and Royster.

According to certified documents, Killa Mobb member minor J.D. was charged with burglary in December 2006 and admitted to battery in January 2007, "a reasonably related offense" to the burglary.  According to other certified documents, minor C.B. admitted in November 2007 to possession of a concealable firearm by a minor.  One of his conditions of probation was not to knowingly associate with gangs and to tell the probation officer of his street moniker.  During a conversation, C.B. told Detective Bell he was a member of Killa Mobb at the time of this crime.

The parties stipulated that Lee had been convicted of "assault with a firearm" that occurred during the second half of 2008 and he admitted that crime was committed for the benefit of or in association with Killa Mobb.

In mid-October 2008, Atwaal and other Killa Mobb members shot at an occupied car at an am/pm market in an incident in which Killa Mobb members were the aggressors.

*People v. Cornelius*, No. C073004, 2016 WL 5112052, at *1-3 (Cal. Ct. App. Sept. 21, 2016).

At the conclusion of trial, Kemokai's jury found him guilty of attempted murder, mayhem, assault with a firearm, and grand theft from a person, a lesser-included offense to the charged robbery.[2]  Kemokai's jury also found true the gang and firearm enhancements.  The trial court sentenced Kemokai to 30 years' imprisonment.[3]

Through counsel, Kemokai appealed his conviction, arguing that: 1) the court prejudicially erred in refusing to bifurcate trial of the gang enhancement allegations from the trial of the charged offenses; 2) the attempted murder conviction must be reversed because there was legally insufficient evidence that Kemokai acted with the specific intent to kill; 3) the

---

[2]   Another jury found Christian guilty of the same crimes.  A third jury found Cornelius guilty of attempted murder, assault with a firearm, and grand theft from a person, a lesser-included offense to the charged robbery.  A fourth jury found defendant Xavier Whitfield guilty of assault with a firearm.  The juries also found true the gang and firearm enhancements.

[3]   Christian was also sentenced to 30 years' imprisonment.  The trial court sentenced Cornelius and Whitfield to imprisonment terms of 20 and 15 years, respectively.

evidence presented at trial was insufficient to sustain the criminal street gang enhancement because the prosecution failed to prove that Killa Mobb was a criminal street gang within the meaning of California law; and 4) trial counsel was ineffective for failing to object to unauthenticated photos.  The Court of Appeal unanimously affirmed the judgment against Kemokai in a reasoned, unpublished opinion issued on September 21, 2016.  *Cornelius*, 2016 WL 5112052, at *15.[4]  Kemokai petitioned for review in the California Supreme Court, which was summarily denied on January 11, 2017.  Docket No. 20-7.

Kemokai then timely filed a Petition for a Writ of Habeas Corpus in this Court on August 15, 2017.  Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1),(2).

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Kemokai argues that: 1) the trial court erroneously denied Kemokai's request for a foundational hearing on the proffered gang expert testimony; 2) the trial court erred in denying Kemokai's motion to bifurcate trial on the gang enhancement allegations from the trial of the charged offenses; 3) the trial court committed reversible error by defining a primary activity as gun possession with respect to whether Killa Mobb was a criminal street gang; 4) trial counsel was ineffective for failing to object to unauthenticated photos showing gang symbols; 5) the evidence presented for the attempted murder conviction was legally insufficient to show that Kemokai acted with the specific intent to kill; 6) the trial court erred by failing to grant the motion for a new trial based on prejudicial

---

[4]    The Court of Appeal also affirmed the judgments as to Christian and Whitfield. As to Cornelius only, the appellate court struck the 10-year consecutive prison term for personal use of a firearm because Cornelius did not personally use a firearm.  *Cornelius*, 2016 WL 5112052, at *15.

juror misconduct; and 7) Kemokai's conviction should be reversed due to the cumulative effect of the trial court's errors.

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).  The term unreasonable is a common term in the legal world.  The Supreme Court has cautioned, however, that the range of reasonable judgments may depend in part on the nature of the relevant rule argued to be clearly established federal law.  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

IV. DISCUSSION

Ground 1.     Lack of Foundational Hearing on Gang Expert Testimony

Under California law, expert testimony on criminal street gangs is admissible to prove

the elements of the criminal street gang substantive offense and the gang enhancement.  *See*

*People v. Jasso*, 150 Cal. Rptr. 3d 464, 484 (Cal. Ct. App. 2012) (relying on expert testimony in

part to support a conviction for the substantive offense); *see also People v. Hernandez*, 94 P.3d

1080, 1085 (Cal. 2004) ("In order to prove the elements of the criminal street gang enhancement,

the prosecution may, as in this case, present expert testimony on criminal street gangs.").

Kemokai nonetheless argues that the trial court erred in admitting gang expert testimony in his

case without holding a foundational hearing to assess its reliability and the grounds upon which

it was based.  The Court of Appeal found the claim forfeited and rejected it on that basis:

> Whitfield contends the trial court erred in denying his request for an in limine
> hearing pursuant to Evidence Code section 402 (the procedure for determining
> foundational and other preliminary facts) and Evidence Code section 352 to determine
> whether at trial Detective Bell would rely on inadmissible and/or unduly prejudicial
> hearsay to support his opinion that certain offenses constituted the primary activities of
> Killa Mobb.  Defendants Christian and Kemokai join in these contentions.  As we explain
> below, they have forfeited this contention because, one, the trial court never denied such
> a request and two, defendants never objected when the testimony was proffered, as they
> were required to do.
>
> One, Whitfield's request in the trial court for a section 402 hearing was to
> preclude Detective Bell from relying on hearsay statements to establish Killa Mobb's
> predicate offenses.  But on appeal, Whitfield's argument is not about the predicate
> offenses, but rather, about the primary activities of Killa Mobb, which goes to proving a
> different aspect of the gang enhancement.  Having not raised, in the trial court, the issue
> he now puts forth on appeal, he has forfeited it.  (Evid. Code, § 353; People v. Clark
> (1992) 3 Cal.4th 41, 127-128.)
>
> And two, Whitfield never got a ruling on his motion, even if it could have been
> construed as raising an issue about precluding Detective Bell from testifying regarding
> hearsay in forming his expert opinion about the primary activities of Killa Mobb.
> Specifically, Whitfield initially raised in his trial brief the issue of precluding Detective
> Bell from relying on hearsay statements to prove the predicate offense part of the gang
> enhancement.  The court deferred ruling on this motion and told Whitfield's trial counsel

to raise objections during direct examination of the gang expert.  During trial, Detective Bell testified that Killa Mobb's primary activities included "burglaries, robberies, shootings, [and] unlawful gun possession."  Detective Bell also explained the basis for his opinion.  There was no objection during this testimony.  Thus, Whitfield has forfeited his contentions.  (*See People v. Jennings* (1988) 46 Cal.3d 963, 975, fn. 3 [after an in limine motion, the party seeking exclusion must object at the time evidence is offered to preserve the issue for appeal].)[FN5]

> FN5.   To the extent Whitfield claims his trial counsel was ineffective for failing to object at the time of the trial testimony, we disagree because it was not objectionable, as we explain in part IID below.

*Cornelius*, 2016 WL 5112052, at *4.

Because the state appellate court found this claim forfeited under California's contemporaneous objection rule, it is also procedurally defaulted from federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment).  The Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in affirming denial of a federal habeas petition on grounds of procedural default where there was a complete failure to object at trial.  *See, e.g.*, *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004).  Because the state appellate court held that this claim was forfeited under California's contemporaneous objection rule, it is deemed procedurally defaulted in these proceedings as well and rejected on that basis.

Moreover, to the extent that Kemokai raises an ineffective assistance claim associated with counsel's failure to object to the lack of hearing, such claim also fails.  As discussed more fully with respect to Ground 4, *infra*, to demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that counsel's performance was deficient

and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  Here,

however, Kemokai fails to show that counsel was ineffective or that he was prejudiced by

counsel's omission because, as the Court of Appeal reasonably concluded, the gang expert

testimony was not objectionable.  The record fully supports the Court of Appeal's determination

that Detective Bell's testimony was not based on inadmissible hearsay.  As the appellate court

explained:

> Here, as we have noted, Detective Bell testified that in his expert opinion, the primary activities of Kill Mobb included "burglaries, robberies, shootings, [and] unlawful gun possession."  He based his opinion on his eight and one-half years as a police officer, two and one-half years as a gang detective, being the lead investigator in the current case, being the lead investigator on at least 30 other gang crimes and assisting on 60 other gang crime investigations, reviewing police data bases "for informational purposes to gather . . . information about Killa Mobb," being in daily contact with gang members, including at least 15 members of Killa Mobb, that included "conversations" with Killa Mobb members and associates about that gang's "culture and crimes," and viewing MySpace pages that included photographs of gang members.
>
> Detective Bell did not convey any out-of-court statements to the jury, but rather, relied on some hearsay evidence (for example, conversations with gang members and/or other police offers) as well as his training and expertise to form his expert opinion.  This does not violate the confrontation clause.  (*See United States v. Kamahele* (10th Cir. 2014) 748 F.3d 984, 1000 ["Introduction of opinion testimony does not violate the Confrontation Clause when the experts rely on their independent judgment—even when this independent judgment is based on inadmissible evidence . . ., [b]ut if the expert is simply 'parrot[ing] "out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion," 'the testimony would be inadmissible"]; *United States v. Johnson* (4th Cir. 2009) 587 F.3d 625, 635 [where "the expert is, in essence, giving an independent judgment," "applying his training and experience to the sources before him and reaching an independent judgment," and not "merely acting as a transmitter for testimonial hearsay," "there will typically be no *Crawford* problem"].)  Nor did his viewing and testimony of the photographs on MySpace implicate confrontation clause concerns.  MySpace pages are not testimonial, lack all indicia of formality, and a person making statements on MySpace would not have believed they were participating in the presenting of evidence for a criminal trial.
>
> In sum, there were no out-of-court testimonial statements relied upon or parroted by Detective Bell in reaching his independent judgment about what he considered were the primary activities of Killa Mobb.  As such, there was no confrontation clause violation.

*Cornelius*, 2016 WL 5112052, at *6-7.

Accordingly, Kemokai is not entitled to relief on this ground in any event.

Ground 2.        <u>Failure to Bifurcate Gang Enhancement Allegations from Charged Offenses</u>

Kemokai next contends that the trial court erred by failing to bifurcate the gang

allegations from the underlying offenses, and the admission of evidence of gang violence

violated his due process rights.  The Court of Appeal considered and rejected this claim on direct

appeal as follows:

> Defendants Christian, Kemokai, and Whitfield contend the trial court erred in
> denying their motion to bifurcate the gang enhancements from the trial on the substantive
> offenses.  The trial court denied the motion because "the entire motivation for the
> assaults . . . in this case [is] gang related.  It seems almost impossible to therefore sever
> the gang allegations and to try the particular case without at least the cross-admissibility
> of the . . . gang allegations."  The court acted well within its discretion in denying the
> motion based on the facts available to the court at the time the motion to bifurcate was
> denied.  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048 [standard of review]; *People
> v. Avila* (2006) 38 Cal.4th 491, 575 [a court reviews the motion based on the facts as they
> appeared at the time the court ruled on the motion].)  We explain.
>
> "[T]he criminal street gang enhancement is attached to the charged offense and is,
> by definition, inextricably intertwined with that offense.  So less need for bifurcation
> generally exists with the gang enhancement than with a prior conviction allegation."
> (*People v. Hernandez, supra*, 33 Cal.4th at p. 1048.)  Moreover, gang evidence is often
> relevant to "identity, motive, modus operandi, specific intent, means of applying force or
> fear, or other issues pertinent to guilt of the charged crime."  (*Id.* at p. 1049.)  When this
> is the case, a defendant seeking bifurcation bears the burden " 'to clearly establish that
> there is a substantial danger of prejudice requiring that the charges be separately tried.' "
> (*Id.* at p. 1051.)
>
> Here, when the court denied bifurcation, the court had strong evidence before it
> that the motive for the beating was gang related.  At the preliminary hearing, Detective
> Bell testified that prior to the beating, one of the attackers asked the victim where he was
> from.  The victim responded he was from the Bay Area and added, "you guys are some
> suckas out here."  The attackers then began beating the victim, while one of them
> "announc[ed] Killa Mob[b] gang."  The beating was a means of establishing respect for
> Killa Mobb because if someone in the gang is disrespected and the gang does not act
> upon that, the gang would be perceived as weak.  Thus, the gang evidence was relevant
> to explain motive and the violent reaction based on the victim's verbal slight.  The trial
> court therefore acted within its discretion in denying the motion to bifurcate the gang
> enhancement.

*Cornelius*, 2016 WL 5112052, at *3.

The United States Supreme Court has not determined that a criminal defendant has a federal constitutional right to bifurcation.  *See Spencer v. Texas*, 385 U.S. 554, 565-66 (1967) ("Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure"); *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) (reaffirming *Spencer*); *see also Collins v. Runnels*, 603 F.3d 1127, 1132-33 (9th Cir. 2010) (holding there is no clearly established federal law "requiring severance where defendants present mutually antagonistic defenses").  "The simultaneous trial of more than one offense must actually render petitioner's state trial fundamentally unfair and hence, violative of due process before relief pursuant to 28 U.S.C. § 2254 would be appropriate." *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991) (internal quotation marks and citation omitted); *see also United States v. Lane*, 474 U.S. 438, 446 n.8 (1986) ("misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial").

"In evaluating prejudice, the [federal habeas court] focuses particularly on cross-admissibility of evidence and the danger of 'spillover' from one charge to another, especially where one charge or set of charges is weaker than another."  *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2003).  Undue prejudice exists "whenever joinder of counts allows evidence of other crimes to be introduced in a trial where the evidence would otherwise be inadmissible."  *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000).  The petitioner bears the burden of proving that she is entitled to federal habeas relief on this ground.  *Davis*, 384 F.3d at 638.

Furthermore, even assuming that the denial of the bifurcation motion and resulting admission of the gang evidence in the trial on the substantive offenses violated clearly established Supreme Court law, that error is subject to harmless error analysis. *See Bean v. Calderon*, 163 F.3d 1073, 1086 (9th Cir. 1998) (applying harmless-error analysis to due process violation arising from misjoinder); *Ghent v. Woodford*, 279 F.3d 1121, 1127 (9th Cir. 2002) (same arising from erroneous admission of evidence). Thus, the petitioner must establish that "the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict." *Davis*, 384 F.3d at 638 (internal quotations and citation omitted).

Here, to the extent Kemokai contends that the trial court abused its discretion under California law by failing to bifurcate the gang enhancement allegations, such claim is not legally cognizable on federal habeas review. *See Park v. California*, 202 F.3d 1146, 1150 (9th Cir. 2000) (alleged violation of California law due to misjoinder not cognizable in federal court); *see also Grisby v. Blodgett*, 130 F.3d 365, 270 (9th Cir. 1997) ("We do not depend on state law governing severance in state trials."). Moreover, Kemokai fails to show that the failure to bifurcate the gang enhancements and the subsequent introduction of gang evidence at trial rendered his trial fundamentally unfair. As the Court of Appeal explained, the gang evidence was largely cross-admissible and relevant as to the substantive charges. The Court of Appeal's conclusion is both reasonable and fully supported by the record. Kemokai is not entitled to relief on this ground either.

Ground 3.    <u>Instructional Error as to Criminal Street Gang Definition</u>

Kemokai additionally avers that the trial court prejudicially erred in instructing the jury as to the criminal street gang definition. Namely, the court instructed the jury that possession of

a firearm qualifies as a primary activity for purposes of the gang enhancement.  As the Court of
Appeal recognized, the trial court erred in its instruction because it did not specify that only
*prohibited* possession of a firearm qualifies as a primary activity.  Nonetheless, the Court of
Appeal concluded that Kemokai was not prejudiced by the error.  *Cornelius*, 2016 WL 5112052,
at *5.

Because jury instructions in state trial are typically matters of state law, federal courts are
bound by a state appellate court's determination that a jury instruction was not warranted under
state law.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has
repeatedly held that "a state court's interpretation of state law, including one announced on
direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see
also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  An instructional error,
therefore, "does not alone raise a ground cognizable in a federal habeas proceeding."
*Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable
likelihood that the jury has applied the challenged instruction in a way that prevents the
consideration of constitutionally relevant evidence."  *Boyde v. California*, 494 U.S. 370, 380
(1990).  The question is whether the instruction, when read in the context of the jury charges as a
whole, is sufficiently erroneous to violate the Fourteenth Amendment.  *Francis v. Franklin*, 471
U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary
that the jury followed those instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000);
*Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the

law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id*.

The Due Process Clause of the Fourteenth Amendment requires the prosecution to prove every element charged in a criminal offense beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364 (1970). "[T]he Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). A federal habeas court "must determine whether there was a reasonable likelihood that the jury understood the instruction to allow a conviction predicated on proof that was insufficient to meet the requirements of due process." *Lisenbee v. Henry*, 166 F.3d 997, 999 (9th Cir. 1999) (*citing Ramirez v. Hatcher*, 136 F.3d 1209, 1213 (9th Cir. 1998)).

The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary

that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000);

*Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the

law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the

subject in depth).

Here, the Court of Appeal agreed that the trial court's instruction was erroneous.  It

nonetheless determined that the error was harmless.  The appellate court explained:

> For purposes of the gang enhancement, only "prohibited" possession of a firearm
> qualifies as a primary activity.  (Pen. Code, § 186.22, subds. (f), (e)(31)-(e)(33).)  The
> instruction here was wrong because it did not specify that only prohibited possession of a
> firearm qualified.  Nevertheless, there was no prejudice, under either the federal or
> state-based standards of review.  (*Chapman v. California* (1967) 386 U.S. 18, 24 [17
> L.Ed.2d 705, 710-711] ["before a federal constitutional error can be held harmless, the
> court must be able to declare a belief that it was harmless beyond a reasonable doubt"];
> *People v. Watson* (1956) 46 Cal.2d 818, 836 [before a state error can be held harmless,
> the court must be able to declare that it is not "reasonably probable that a result more
> favorable to the appealing party would have been reached in the absence of the error"].)
> The only possession of a firearm as an offense brought up by the prosecutor with respect
> to the gang enhancement both at trial and in closing was that of C.B., namely, his illegal
> gun possession as a minor.  The prosecutor in closing stressed that he had introduced into
> evidence certified copies of the juvenile record, showing what the juvenile was
> "convicted of" so "[i]t's just proof beyond anybody's word, beyond any doubt because
> it's a certified court record."  As even Whitfield points out in his brief, C.B.'s "juvenile
> unlawful firearm possession adjudication was the only legitimate evidence of an
> enumerated firearm offense."  Thus, where the only evidence of gun possession that the
> People relied on at trial and stressed in closing was unlawful gun possession for which
> proof was a certified court record that the defense did not rebut, the error was harmless
> beyond a reasonable doubt.

*Cornelius*, 2016 WL 5112052, at *5.

Although the California Court of Appeal applied the *Chapman* harmless error standard

on direct review, "[b]ecause [Kemokai] seeks federal habeas corpus relief, he must meet the

*Brecht* standard," which "'subsumes' the requirements that § 2254(d) imposes when a federal

habeas petitioner contests a state court's determination that a constitutional error was harmless

under *Chapman*." *Davis v. Ayala*, 576 U.S. 257, 135 S. Ct. 2187, 2198 (2015) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (citation omitted) (relief is warranted only where error had a "substantial and injurious effect or influence in determining the jury's verdict"); *Mays v. Clark*, 807 F.3d 968, 980 (9th Cir. 2015) ("Because it is more stringent, the *Brecht* test 'subsumes' the AEDPA/*Chapman* standard for review of a state court determination of the harmlessness of a constitutional violation.  A federal habeas court therefore need not formally apply both the *Brecht* test and the AEDPA standard; it is sufficient to apply *Brecht* alone."). Therefore, the Court here applies "the *Brecht* test, but . . . do[es] so with due consideration of the state court's reasons for concluding that the error was harmless beyond a reasonable doubt." *Garcia v. Long*, 808 F.3d 771, 782 (9th Cir. 2015).

Although the trial court failed to distinguish between lawful and unlawful gun possession in its definition of the primary activity element, any possible error did not have a substantial and injurious effect or influence in determining the jury's verdict.  *See Brecht*, 507 U.S. at 623.  The record fully supports the Court of Appeal's determination that the only evidence of gun possession introduced at trial was unlawful gun possession, and thus it is not reasonably possible that the jury erroneously relied on lawful gun possession in finding true the primary activity element of the gang enhancement.  Kemokai's instructional error claim therefore fails.

Ground 4.      Ineffective Assistance of Trial Counsel–Unauthenticated Photos

Kemokai next contends that trial counsel was ineffective for failing to object to what he claims were unauthenticated photographs introduced into evidence during the testimony of Detective Bell that showed people other than Kemokai making gang-related hand signs.

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Kemokai must show that his trial counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

Here, Kemokai fails to demonstrate that counsel's inaction demonstrates *Strickland* deficiency. As the Court of Appeal reasonably concluded on direct appeal:

> Kemokai cannot prove his counsel was ineffective because counsel could have had a tactical reason not to object: Kemokai was not identified as being in any of these pictures. Counsel may have reasonably concluded that the pictures helped Kemokai's defense because the jury could have believed that Kemokai's absence from all of these pictures meant he was not actually a member or associate of Killa Mobb.

*Cornelius*, 2016 WL 5112052, at *11.

Such conclusion is reasonable and fully supported by the record. Kemokai thus fails to establish that counsel was ineffective, and he is not entitled to relief on this ground.

Ground 5.        Insufficiency of the Evidence as to the Attempted Murder Conviction

Kemokai also argues that there was insufficient evidence presented at trial to support his conviction for attempted murder because there was no evidence that he intended to kill Robinson. As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable

to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of

constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Id*. Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id*. (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

The Court of Appeal considered and rejected Kemokai insufficiency of the evidence claims on direct appeal as follows:

> Christian and Kemokai contend insufficient evidence supported their convictions for attempted murder because there was no evidence they intended to kill the victim. Not so.
> The victim testified Christian instigated the beating by hitting him on the head, rendering him temporarily unconscious. In addition, the part of the group beating captured on video showed Christian and Kemokai actively involved in beating the victim in vulnerable places on his body when he was on the ground and defenseless. Specifically, Christian lifted his arm over his head and swung downward toward the victim. The victim tried to roll away from the attack, but Christian and Kemokai pursued him. Christian kicked the victim in the head. Kemokai hit the victim in the upper body/head area with two overhead, heavy blows. Christian pistol-whipped the victim in the head after he had been searched for his possessions. After Christian fled, Kemokai

21

pulled out a firearm, raised it over his head, and hit the victim's head.  As a result of all this trauma, the victim had multiple lacerations to his head and face, a fracture to the upper jaw, and was at risk of a concussion and serious neck injury.

       Christian's and Kemokai's repeated kicks, blows, and pistol whips to the victim's head, a vulnerable spot for death, at a time when he was defenseless were more than sufficient to demonstrate they intended to kill the victim.  (*People v. Lasko* (2000) 23 Cal.4th 101, 112 ["the evidence strongly suggested an intent to kill" where the defendant hit the victim multiple times on the head with extreme force, causing extensive and multiple fractures to the head area].)

*Cornelius*, 2016 WL 5112052, at *9.

Under California law, to prove attempted murder, there must be express malice, *i.e.*, the intent to kill.  *People v. Stone*, 92 Cal. Rptr. 3d 362, 368 (Cal. 2009) (quotations and citation omitted).  The requisite intent to kill is most often inferred from the defendant's acts and the circumstances of the crime because "[t]here is rarely direct evidence of a defendant's intent." *People v. Smith*, 37 Cal. Rptr. 3d 163, 169 (Cal. 2005).  Moreover, evidence of motive–although not required–"is often probative of intent to kill."  *Id.* at 168.

In support of his claim, Kemokai avers:

       If Kemokai wanted to kill Robinson, he could have simply squeezed the trigger. But he didn't.  So, the evidence here–that, after the melee, rather than shooting at Robinson, Kemokai struck him in the fact one time with his gun as if to knock him out– showed, at best, a conscious disregard for life or implied malice.  There was no substantial evidence that Kemokai acted with express malice–i.e., with the specific intent to kill Robinson or with a "substantial certainty" he would actually cause Robinson's death.

But in rejecting on direct appeal Kemokai's claim that the evidence was insufficient to prove that he intended to kill Robinson, the Court of Appeal's application of the *Jackson* standard was not objectively unreasonable.  When viewing the evidence in the light most favorable to the prosecution and resolving all conflicts in the evidence in favor of the jury's verdict, a rational juror could have determined beyond a reasonable doubt that Kemokai's

actions evinced the requisite intent to kill.  While it may have been possible fo the jury to come

to another conclusion, all of the evidence in support of his claim was before the jury for its

assessment.  This Court is precluded from re-weighing the evidence or re-assessing witness

credibility.  *Schlup*, 513 U.S at 330; *Bruce v. Terhune*, 376 F.3d 950, 957-58 (9th Cir. 2004).

Kemokai is thus not entitled to relief on this claim.

Ground 6.      Prejudicial Juror Misconduct

Kemokai further contends that numerous instances of prejudicial juror misconduct

deprived him of a fair trial, warranting habeas relief.  The Court of Appeal considered and

rejected the allegations of misconduct as follows:

> We take each of the seven misconduct allegations in turn, keeping in mind the
> following standards:
> "When a party seeks a new trial based on juror misconduct, the trial court must
> determine from admissible evidence whether misconduct occurred and, if it did, whether
> the misconduct was prejudicial.  [Citation.]  Prejudice is presumed where there is
> misconduct.  This presumption can be rebutted by a showing no prejudice actually
> occurred or by a reviewing court's examination of the entire record to determine whether
> there is a reasonable probability of actual harm to the complaining party."  (*People v.
> Loot* (1998) 63 Cal.App.4th 694, 697.)  "The moving party bears the burden of
> establishing juror misconduct."  (*Donovan v. Poway Unified School Dist.* (2008) 167
> Cal.App.4th 567, 625.)
> "We review independently the trial court's denial of a new trial motion based on
> alleged juror misconduct. [Citation.]  However, we will '"accept the trial court's
> credibility determinations and findings on questions of historical fact if supported by
> substantial evidence."'"  (*People v. Gamache* (2010) 48 Cal.4th 347, 396.)
>
> A
> Juror No. 1's Failure To Disclose That His Brother-In-Law
> Was Killed By A Drunk Driver
>
> Whitfield contends that Juror No. 1 committed prejudicial misconduct by
> "willfully conceal[ing]" that his brother-in-law was killed by a drunk driver.  The trial
> court found misconduct but was "not willing to jump to the conclusion that it was
> intentional concealment designed to mislead."  As our court has noted, "[i]n evaluating
> claims of intentional concealment by jurors during voir dire, '[w]e accept the trial court's
> credibility determinations and findings on questions of historical fact if supported by

substantial evidence.' [Citations.]  With these principles in mind, we consider defendants' claims of misconduct by Juror No. [1]."  (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 371-372.)

Here, there was substantial evidence that Juror No. 1 did not intentionally conceal this information.  The at-issue voir dire question to which Juror No. 1 answered "No" in April 2010 was the following: "Have you, a close friend or relative ever been a victim of a crime?  If yes, state the nature of the crime(s)."  On Juror No. 1's Facebook page, there was a post in May 2010 stating the following: "It's been said that the first year following the sudden death of a loved one is the most difficult, THAT'S WHY MY PAGE IS DEDICATED TO MY SISTER ALICIA IN HONOR OF MOTHERS/FATHERS DAY, my sister lost her husband by a selfish act [of] a DRUNK DRIVER rip Arnold . . .  Alicia you and you[ ]r[ ] five girls are SURVIVORS . . . THANK YOU GOD for giving them the strength . . ."  In June 2012, Juror No. 1 posted, "me and Arnold good times . . . in my . . . heart forever . . . rip."

These posts do not indicate the drunk driver who killed Juror No. 1's brother-in-law was ever charged with a crime.  Thus, Juror No. 1 may have simply categorized this incident as a traffic fatality or traffic accident instead of a criminal act.  Thus, we agree with the trial court there was no evidence that his failure to disclose the killing of his brother-in-law by a drunk driver was an intentional concealment designed to mislead.

B

Juror No. 1's Postings On Facebook About This Trial

During trial, the court instructed jurors, "do not talk about the case . . . with anyone . . . .  Do not share information about the case in writing, by e-mail or on the Internet."

During trial, Juror No. 1 stated on Facebook that he was on jury duty with postings such as the following: "Jury duty week three and we still don't have all the panel selected"; "After all the stupid excuses and people saying they hate police and black people to get off jury duty hmmmm. . . .  Maybe [I] should have c[o]me up with a lame excuse also"; "my case was suppose[d] to last six weeks and we['']re on week three now and no end in sight[,] this sucks"; "[l]ooks like a two week stay for me @ jury duty . . ."; "Fourth week of jury duty and six weeks to go LUCKY ME . . ."; "getting ready for jury duty"; "Week 5 of jury duty"; "Jury duty week six . . ."; and "Back to jury duty can it get any more BORING than going over metro pcs phone records . . . uuuggghhhhhh."

At a hearing about these Facebook entries, Juror No. 1 testified that when he made these posts, he did not think "at the time" he was violating the court's admonition because he did not think he was talking about the case.  He "really didn't read the comments" that people wrote in response to his posts.  The court found that Juror No. 1 was "credible" and that he was "doing [his] best to be open and honest . . . ."  The court nevertheless found misconduct, but also found no "actual bias" on the part of Juror No. 1 and no "inherent[ ] prejudice[ ] as a result of that misconduct."

24

"[T]he misconduct of discussing the case with nonjurors while the case is pending" "raises the presumption of prejudice," but "[t]his presumption of prejudice '"may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party [resulting from the misconduct]. . . ."'" (*In re Hitchings* (1993) 6 Cal.4th 97, 119.)

We agree with the trial court there was no prejudice on our de novo review.  Most of these postings were simply statements that Juror No. 1 was still on jury duty and revealed nothing about the evidence or his thoughts on the case.  One that was not (expressing his boredom with the testimony about the phone records) actually cut against the prosecution, who was the party who presented those records.

Defendants claim that the other ones that went beyond simply stating he was on jury duty "demonstrate[d] mockery and even contempt for the judicial process."  These included "Maybe [I] should have c[o]me up with a lame excuse also" to get out of jury duty, "no end in sight[,] this sucks," and "six weeks to go LUCKY ME . . . ."  Fairly understood, these comments expressed frustration at the length of the case.  There was no evidence Juror No. 1 took out this frustration on defendants.  Instead, quite the opposite.  The jury acquitted four defendants (three appellants and one codefendant) of various charges, demonstrating there was no reasonable probability of actual harm based on his Facebook postings.

C

Juror No. 1 Discussing On Facebook Where The Trial Was Being Held And "Arranging" For An Acquaintance To View The Trial

Whitfield contends that Juror No. 1 "may have misled the Court" by arranging a court visit for a nonjuror to watch the trial and then agreeing to lie about knowing the nonjuror when she came to court.

The facts behind the planned visit were these.  On May 28, 2010, a female acquaintance of Juror No. 1 initiated a Facebook conversation with him and asked him the "address" of the trial and asked how long he had been on the case.  Juror No. 1 responded "six weeks . . . the address is 720 9th street . . . Court house is closed until Tuesday" and later added it was department 31 on level 4.  The female acquaintance responded, "Thank you.  Can you talk about the case?"  Juror No. 1 replied, "sorry [I] can't talk about the case . . . btw if u come to the courtroom [I] have [to] act like [I] don't know you. . . ."  The female acquaintance responded, "That's what I thought, I was making sure :)  Okay  THANK YOU for the info!  And don't worry about it, I understand!"

The trial court found that Juror No. 1 had not misled the court, and that finding was supported by substantial evidence.  (*See People v. Gamache*, *supra*, 48 Cal.4th at p. 396 [standard of review].)  Juror No. 1 told the acquaintance only where the trial was and then correctly informed her that he could not talk about the case.  In regard to Juror No. 1 having to act like he did not know her, Whitfield contends he "agreed to lie and, if

25

queried, to denying knowing [her]."  There is no evidence this acquaintance ever came to court and had any interaction with Juror No. 1.

To the extent Whitfield points to the following testimony from Juror No. 1 that the court solicited out of the presence of the jury and audience members on May 18, 2010, about somebody Juror No. 1 knew in the audience, that audience member was male, so it could not have been the same person as the Facebook acquaintance.  In any event, the evidence about the male acquaintance provides additional support for the court's credibility determination about Juror No. 1.  As to the male acquaintance who showed up on May 18 and "approached [Juror No. 1]," the court found the situation "truly innocuous."  Juror No. 1 testified this was somebody with whom he worked previously, he did not know that his former coworker was in the audience until his former coworker approached him, this was the first time he had seen his former coworker in three or four years, he was not going to hold anything against anybody in this case, and that he would be able to listen to the evidence here and decide the case just on that evidence.

D
Juror No. 1 Discussing Postverdict Hearing Testimony

Whitfield contends that Juror No. 1 committed misconduct by violating the trial court's admonition not to discuss any postverdict hearing testimony.  We disagree.

During the postverdict hearing on juror misconduct, jurors were separately questioned, and Juror No. 1 was "admonish[ed] . . . not to discuss anything about our conversation with anyone."  Whitfield contends Juror No. 1 defied this admonition.

The fatal problem for Whitfield's contention is it is based on inadmissible hearsay statements made to the trial court by Christian's trial counsel.  Specifically, Christian's trial counsel told the court that Juror No. 5 had called someone in his office and told that person Juror No. 1 had followed Juror No. 5 to her car, and "continually asked [Juror No. 5] what was going on and what kind of questions she received here in Court.  [Juror No. 5] felt uncomfortable and told [Juror No. 1] that, The Judge specifically said we can't talk about this, and his response was that, It's okay, [i]t's all over, you can talk about it."  These "[u]nsworn statements cannot be used to establish juror misconduct."  (*People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1043.)

E
Receipt Of Outside Information Regarding Killa Mobb By Juror No. 1

Whitfield and Cornelius contend that Juror No. 1 committed misconduct by concealing receipt of outside information regarding Killa Mobb.  This contention is based on a declaration signed by Juror No. 5 dated August 10, 2010.  In it, Juror No. 5 stated as follows: "after the jury verdict was delivered, the foreman, juror number 1, stated that a co-worker had explained to him after the trial that he knew 'Killa Mobb' from high school and that they were a gang and that the guys in this case were bad guys."

26

The fatal problem with this contention is that defendants speculate that Juror No. 1 received this information about Killa Mobb before or during trial. However, Juror No. 5's declaration states that the information about Killa Mobb was relayed to Juror No. 1 "after the trial." A reasonable interpretation of the phrase "after the trial" is postverdict. With this interpretation, there was no misconduct because Juror No. 1's receipt of this information postverdict "does not show bias during the trial, deliberations, and verdict." (*In re Carpenter* (1995) 9 Cal.4th 634, 657.) As defendants acknowledge, the trial court did not explore this topic (Juror No. 1's receipt of information about Killa Mobb) in the postverdict juror voir dire. "[T]he initial burden is on defendant to prove the misconduct. [Citation.] We will not presume greater misconduct than the evidence shows." (*In re Carpenter*, at p. 657.) Here, defendants have not shown any misconduct because they have not established that Juror No. 1 received outside information about Killa Mobb at any time other than postverdict.

F

Allegation That Juror No. 8 Concealed Her Inability To Abide By The
Standard Of Proof Beyond A Reasonable Doubt

Whitfield and Cornelius contend Juror No. 8 committed misconduct because she was unable to follow the court's instruction requiring the People prove defendants' guilt beyond a reasonable doubt and that she concealed her inability to follow that instruction.

Defendants have not carried their initial burden to prove misconduct because their argument is not supported by the facts, and the trial court specifically found Juror No. 8 credible. (*In re Carpenter*, *supra*, 9 Cal.4th at p. 657.) We explain below.

Juror No. 5 testified at a postverdict hearing that Juror No. 8 made a comment at some point "towards the beginning or the middle of the trial" that her son had been a juror in a DUI trial and those jurors had found the defendant guilty "because there was no defense. Of course they had to find him guilty." This comment made Juror No. 5 "uneasy."

Juror No. 8 then testified the comment she made was that the defendant in her son's case did not have a defense. This had nothing to do with the current case. She "didn't care if [the current defendants] testified or not. That was their right." The court found Juror No. 8 "credible" and it "did not get an impression . . . that there was an effort to hide anything."

On our independent review, we find no misconduct, given the testimony of Juror No. 8 that the court credited. (*See People v. Gamache*, *supra*, 48 Cal.4th at p. 396 [standard of review].) Juror No. 8's comment about her son's jury service had only to do with that case, had no impact on her reasoning in this case, and she did not care whether defendants here testified because that was their right.

G

Juror No. 1 And Juror No. 8 Conferring Regarding The Postverdict
Hearing On Juror Misconduct

Whitfield and Cornelius contend Jurors Nos. 1 and 8 committed misconduct by conferring with one another after being notified about the postverdict hearing but before they testified at that hearing.

The evidence was that before the postverdict hearing, Juror No. 8 emailed Juror No. 1 and told him she (Juror No. 8) had received a call from the court to come to the postverdict hearing and was wondering if Juror No. 1 had received the same call.  Juror No. 1 responded that he also got the call and was coming in.  Juror No. 8 then emailed Juror No. 1 that she had looked online that "they were requesting a retrial, but [she] didn't know why."

The fatal problem with defendants' misconduct contention based on this testimony is that there is no evidence either juror violated a court order or instruction that told them not to communicate with the other jurors before the postverdict hearing.[FN8]  Thus, there is no basis on which to find misconduct from this communication between the two jurors.

FN8.   There is also no evidence Juror No. 8 lied to the court about the nature or contents of the communication, as the trial court found Juror No. 8's testimony credible.

*Cornelius*, 2016 WL 5112052, at *11-15.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, *by an impartial jury*."  U.S. CONST. amend VI (emphasis added).  The right to an impartial jury is further applicable to the states by way of the Fourteenth Amendment.  *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  "The bias or prejudice of even a single juror is enough to violate that guarantee." *United States v. Olsen*, 704 F.3d 1172, 1189 (9th Cir. 2013) (quoting *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000)).  However, the constitution "does not require a new trial every time a juror has been placed in a compromising situation."  *Tinsley v. Borg*, 895 F.2d 520, 524 (9th Cir. 1990) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)).  "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  *Id.* (quoting *Phillips*, 895 F.2d at 217).

28

The Ninth Circuit has recognized three forms of juror bias: 1) "actual bias, which stems from a pre-set disposition not to decide an issue impartially"; 2) "implied (or presumptive) bias, which may exist in exceptional circumstances where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury"; and 3) "so-called *McDonough*-style bias, which turns on the truthfulness of a juror's responses on voir dire" where a truthful response "would have provided a valid basis for a challenge for cause." *Fields v. Brown*, 503 F.3d 755, 766-67 (9th Cir. 2007) (citing *McDonough Power Equip. v. Greenwood*, 464 U.S. 548 (1984) (plurality)).

In support of his claim, Kemokai conclusorily states that "[t]his record discloses that two jurors who decided [Kemokai's] fate committed acts of misconduct and manifested actual bias as well as implied bias." But Kemokai fails to provide any support establishing the implied or actual bias of Juror No. 1 or Juror No. 8.

Where a hearing has been held on juror impartiality and the fact-finding process was objective and reasonably explored the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness. *Dyer*, 151 F.3 at 975. A petitioner must therefore present clear and convincing evidence to rebut this presumption. 28 U.S.C. § 2254(e)(1); *Miller-El*, 537 U.S. at 340. The Supreme Court has made it clear that on federal habeas review, the determination of juror bias "is essentially one of credibility, and therefore largely one of demeanor." *Tinsley*, 895 F.2d at 525 (quoting *Patton v. Yount*, 467 U.S. 1025, 1038) (internal quotation marks omitted). The findings of state trial and appellate courts on juror impartiality deserve "a high measure of deference." *Id*. (citation omitted).

29

Here, Kemokai has not rebutted with clear and convincing evidence the state trial court's finding of no bias.  Rather, Kemokai urges this Court to re-assess the testimony and credibility of the jurors.  Federal law is clear, however, that the state court was in the best position to assess the demeanor and weigh the credibility of the juror in question.  *See Yount*, 467 U.S. at 1038 ("Demeanor plays a fundamental role not only in determining juror credibility, but also in simply understanding what a potential juror is saying. . . . Demeanor, inflection, the flow of questions and answers can make confused and conflicting utterances comprehensible.").  Because he fails to provide any evidentiary support for his claim, and fails to show that the decision of the state courts is anything but reasonable, Kemokai is not entitled to relief on this claim.  *Woodford v. Visciotti*, 537 U.S. 19, 15 (2002) (*per curiam*) (holding that state habeas petitioner carries the burden of proof).

Ground 7.   <u>Cumulative Error</u>

Finally, Kemokai claims that the cumulative effect of the alleged errors raised above warrant reversal of his conviction.  The Ninth Circuit has stated "[t]he Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair."  *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)); *see also Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000).  "Cumulative error applies where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors has still prejudiced a defendant."  *Jackson v. Brown*, 513 F.3d 1057, 1085 (9th Cir. 2008) (quoting *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000)).  Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error

review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)).

"While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness." *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers*, 410 U.S. at 298, 302-03). Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (citation omitted). In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process. *See Chambers*, 410 U.S. at 294.

As discussed throughout this opinion, Kemokai does not demonstrate federal constitutional errors that would establish prejudice in the aggregate. *See, e.g.*, *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible."). As the Court of Appeal reasonably determined on direct appeal, Kemokai's trial involved "only one error (the instruction defining possession of a firearm as a primary activity of Killa Mobb) that was harmless, so there are no multiple errors to accumulate." *Cornelius*, 2016 WL 5112052, at *11. Kemokai is therefore not entitled to relief on this claim.

## V. CONCLUSION AND ORDER

Kemokai is not entitled to relief on any ground raised in his Petition.

31

      **IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

      **IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* Fed. R. App. P. 22(b); 9th Cir. R. 22-1.

      The Clerk of the Court is to enter judgment accordingly.

      Dated: June 4, 2020.

                                                    /s/James K. Singleton, Jr.
                                                    JAMES K. SINGLETON, JR.
                                                    Senior United States District Judge